## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **MARGARET E. LORIS and KELLI** | : | |
| **HIBBARD,** | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | **No. 3:04-cv-1036 (WWE)** |
| | : | |
| **DR. LYNNE MOORE, individually and** | : | |
| **in her official capacity,** | : | |
| **DR. SALVATORE CORDA,** | : | |
| **individually and in his official** | : | |
| **capacity, and** | : | |
| **NORWALK BOARD OF EDUCATION,** | : | |
| **Defendants.** | : | |

## MEMORANDUM OF DECISION ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

In their multi-count complaint, plaintiffs Margaret ("Peggie") Loris and Kelli Hibbard assert that they have suffered retaliation for exercise of their First Amendment right to free speech and racial discrimination due to the conduct of defendants Dr. Lynne Moore, Principal of West Rocks Middle School, Dr. Salvatore Corda, Superintendent of the Norwalk Public Schools, and the Board of Education for the City of Norwalk ("Board"). The complaint alleges the following nineteen counts: Retaliation based on plaintiffs' exercise of free speech in violation of 42 U.S.C. § 1983 against defendant Moore in her official and individual capacity (counts one and two); racial discrimination in violation of Section 1983 against Moore in her official and individual capacity (counts three and four); retaliation based on plaintiffs' exercise of free speech in violation of Section 1983 against defendant Corda in his official and individual capacity (counts five and six); racial discrimination in violation of Section 1983 against

defendant Corda in his official and individual capacity (counts seven and eight); retaliation based on plaintiffs' exercise of free speech against the Board (count nine); racial discrimination in violation of Section 1983, Title VII and the Connecticut Fair Employment Practices Act ("CFEPA") against the Board (counts ten, eleven and thirteen); retaliation in violation of Title VII and CFEPA against the Board (counts twelve and fourteen); negligent hiring of defendant Moore against the Board (count fifteen); violation of Connecticut General Statutes sections 31-51q and 31-51m against all defendants (counts seventeen and eighteen); and violation of plaintiffs' due process rights pursuant to Section 1983 against all defendants (count nineteen).

Defendants move for summary judgment on the complaint in its entirety. For the following reasons, the Court will grant the motion for summary judgment.

## BACKGROUND

The parties have filed statements of fact, affidavits and exhibits, which reveal the following factual background.

Loris

Plantiff Loris, a Caucasian woman, was formerly a sixth-grade language arts teacher at West Rocks Middle School ("WRMS"). At WRMS, Loris served as a team leader of the "Gold Team," a position which entitled her to a stipend in addition to her salary.[1]

Defendant Moore has served as Principal of WRMS since 1998. Defendant Corda has served as Superintendent of Schools since April 1, 2001.

_____

[1]During the course of this litigation, Loris transferred to an eighth-grade language arts position at Nathan Hale Middle School.

On December 20, 1999, Moore notified all team leaders about an assembly in January 2000 to commemorate Dr. Martin Luther King, Jr.  In that same correspondence, Moore asked the team leaders to give her a January date for a Town Meeting to discuss Dr. Martin Luther King, Jr.  She also requested that she be informed of who would serve as each team's representative.

The members of the Gold Team informed Moore that they did not feel it was necessary to have two Dr. Martin Luther King, Jr. assemblies because they believed that the students' work in language arts and social studies served the same purpose.

In a letter to Loris dated January 27, 2000, Moore quoted the reasons that Loris, on behalf of the Team, had offered for not participating in the Town Meeting:

> We felt that our students were adequately prepared for the assembly.  You did not direct us to attend the Town Meeting.  We were giving you input.  I had novels to work on . . . .  There were projects in Science . . . , Social Studies, and math.  We are good at what we do.  We just want to do our job.  We just want to teach.  We work well together.  We did not see any disadvantages in not participating in the Town Meeting.

In the fourth paragraph of her letter, Moore observed that Loris' comments and the tone of her voice gave the distinct impression that Loris "did not comprehend, as team leader, the value of the work of the entire school as the work related to Dr. King and our school assembly."  The letter explained:

> It is expected that you will follow the directives of the school leadership.  If you do not agree with a decision of the administration, you have the right to grieve the decision.  In addition, I want to put you on notice that the position of team leader, in which you are currently serving, may not be a position in which you can serve in the future.

Moore sent a letter to each of the Gold Team members that was placed in each respective teacher's personnel file.

3

The Norwalk Federation of Teachers ("NFT") filed a grievance on behalf of the Gold Team teachers to have the letters removed from the teachers' personnel files.[2] The grievance decision noted that the Gold Team had acted "in what might be viewed by some as in an insubordinate manner." The grievance was "denied with modifications." With respect to the letter to Loris, the grievance decision required that the fourth paragraph of the letter be removed.

On Loris' 1999-2000 teacher evaluation, Moore praised Loris for her organizational and creative capabilities but included some recommendations regarding her confrontational manner.

Prior to the commencement of the 2003-2004 school year, Loris applied to be Language Arts Subject Leader, a position that came with an annual stipend of $602. The only other applicant, Chris Fulton, was a black male teacher. Defendant Moore and Assistant Principal Antonio Romano interviewed each applicant and selected Mr. Fulton.

On June 18, 2003, plaintiff filed a grievance with Moore concerning the actions of another teacher, Chester Dawson. Moore denied the grievance.[3]

After a conference on September 9, 2003, Moore wrote Loris a letter to remind her that "all parent conferences need to start with positive feedback about a student."

---

[2]The NFT collective bargaining agreement delineates the grievance procedure.

[3]It appears that Loris filed a level two grievance to Superintendent Corda that also concerned her interaction with Dawson. In that grievance, she alleged that the contract between the Board of Education and the NFT had been violated. Corda's decision on the grievance dated October 17, 2003 reflects that Loris requested destruction of (1) Moore's letter dated May 27, 2003 that assessed Loris' behavior and (2) Moore's team leader evaluation of Loris.

Later that month, Moore recommended that Loris use a less confrontational approach in dealing with a student whom Loris had referred to Moore for violating the school policy against cell phone use.  In a letter to Loris dated October 7, 2003, Moore wrote:

> My overall goal at this meeting was to assist you in finding ways of responding to a problem in the most positive manner.  I thought that I was being helpful since there have been a number of matters about which we have discussed.  From my perspective, you basically refused to meet with me until I directed you to do so.  At the meeting, you appeared defensive and did not seem willing to listen.

In a letter dated October 8, 2003 to defendant Moore, Loris complained that Moore had not followed "the ladder of referral with regard to the incident involving a cell phone."  The letter goes on to explain that Loris would not meet with Moore without her NFT representative.

On October 16, 2003, Moore conducted a drop-in observation of Loris' classroom and thereafter asked Loris to stop by to discuss the observation.  Loris responded that she needed further information to help her prepare for their meeting.  That same day, Loris wrote to Superintendent Corda that "Dr. Moore continually harasses and threatens me."

On October 17, 2003, Loris wrote to Bruce Morris, the Board's then-Director of Human Relations, stating that she was making an "official complaint' against Dr. Moore, and that Dr. Moore had harassed, bullied, intimidated and directed reprisals against her.

On October 23, 2003, Loris provided Moore with a schedule for a social work student to observe WRMS on October 24, 2003.  Moore made modifications to Loris' proposed schedule, and she asked to see Loris about the visit on the morning of

October 24.  Although Moore had informed Loris that she would meet with the visitor upon her arrival, Loris brought her directly to her classroom bypassing Moore's office.

On October 30, 2003, Loris approached two students of color who appeared to be fighting during recess.  They both fell into her, causing injury to her wrist.  She referred the two students to Moore for discipline.  On October 31, 2003, the students received notice that they would be suspended.  The parent of one student contacted WRMS to express concern regarding how Loris was "dealing" with her son.

On November 2, 2003, Moore asked to speak with Loris and another team leader because a parent had complained about the showing of a certain movie to the sixth-grade class.  Loris did not meet with Moore, although the other team leader spoke with Moore that same day.  Loris stated that she believed it was sufficient for Moore to speak only with the other team leader since the parent had called regarding one of his students.  Loris did not speak with Moore about the movie until Moore approached her on November 10, 2003.

On November 12, 2003, Moore requested to see Loris regarding a disciplinary referral made by Loris since the parents of the student had questions regarding the incident.  On November 14, Moore contacted Loris about the matter again.  Loris informed Moore that it was not convenient for her to meet with Moore.  An NFT representative arranged for a meeting on November 14.

On November 17, 2003, in response to Loris' complaint against Moore, Morris wrote to Loris that she had failed to "provide any specific information about an event that would establish the basis of a complaint."  Consequently, he did not consider it to

be an official complaint warranting investigation.  He also requested that she provide further information to support her claim.

In an e-mail to Corda dated November 19, 2003, Loris requested that another investigator replace Morris since he was not impartial or objective.  Corda responded that there was no reason to recuse Morris.

Loris subsequently submitted another complaint to Morris, stating that Moore had "singled" her out and targeted her due to her status as a Caucasian woman, team leader, and NFT building steward, who had filed legitimate grievances.  She asserted that Moore held her to a different standard than "every other teacher at WRMS".

On November 25, 2003, Loris and Moore attended a student conference with the Gold Team.  That day, Moore wrote to Loris:

> As a reminder, student conferences must be conducted in a positive manner. The conference with D.A. (conducted on November 25) was very tense and became negative.  It did not seem as if the student had strengths.  As you may recall, the student cried.

In a letter to Moore, Loris responded:

> It is inappropriate and unprofessional for an individual who has arrived tardy to a meeting to comment on the content or purpose of the meeting when that individual has no clear statement of purpose from those who have carefully arranged the meeting and its agenda.

At a Gold Team meeting on January 27, 2004, Moore discussed student eligibility for the Academically Talented program.  During this discussion, Loris asked Moore whether she was calling the team members liars.

In a letter dated January 30, 2004, Morris responded to Loris regarding her complaint:

> After careful review of your complaint and preliminary interview information accompanied with supporting documents, I have determined that yours is not a case of race (Caucasian) or gender (female) based discrimination.  You were given an opportunity to provide evidence to support your claim, you did not provide such evidence.  In regard to claims of race discrimination, you alleged, without any evidence, that Dr. Moore asked an African American teacher to apply for the Subject Area leader position.  I have confirmed that the teacher was asked to apply for the position by another Caucasian teacher.  He was never approached by Dr. Moore as you allege.

On February 2, 2004, Moore conducted a drop-in observation of Loris' classroom and sought to arrange a time to meet with Loris to discuss the observation.  On February 26, 2004, Moore informed Loris that she would discuss a letter from a student who believed that Loris did not want the student to be in her class.   Loris met with Moore on March 4, 2004 with her attorney present, but would not discuss the letter written from the student.

On March 6, 2004, Moore informed Loris that she would meet with her on March 12, 2004 to discuss the student's letter.  By letter, Loris responded that she "would be delighted to participate in the meeting" if Moore could assure her that her participation would have no negative effect on the conditions of her employment.

On March 15, 2004, Moore informed Loris that the mother of another student had called because she believed that Loris did not like him.  The mother stated that Loris had never contacted her, although she had sent her son in with two telephone numbers so that she could be reached.

On June 11, 2004, Moore sent Loris a letter regarding a Planning and Placement Team ("PPT") meeting, stating:

> The parent has not had an easy time with several of her children at West Rocks. As you know, the parent cried at the PPT. I believe that you could have been kinder and gentler with your responses. Later, in the meeting, and after the meeting, you seemed to realize your mistake and made positive responses. As I walked the parent to her car, she did tell me that she has experienced other times when you exhibited impatience toward her.

On June 16, 2004, Moore completed Loris' team leader evaluation for the 2003-2004 school year, noting that Loris had "openly been hostile to the principal," and received input poorly "unless it is input with which Peggie agrees." Moore recommended that a "meeting be scheduled in the Personnel Department to establish job performance targets for the improvement of Peggie's performance as team leader."

On September 27, 2004, Loris refused to participate in a meeting with Moore, Romano, Hibbard, and Fay Ruotolo, a Human Resources Officer, regarding her performance as a team leader since her NFT representative was not present. Ruotolo indicated that since Loris would not participate in the meeting, Moore would proceed with preparing an Improvement Plan for Loris' role as a team leader.

On October 1, 2004, Moore prepared an Improvement Plan, which set goals for Loris and provided that she should meet with Moore and Romano on a monthly basis.

On October 6, 2004, Loris attended a meeting with Moore, although she did not sign the Improvement Plan until October 21, 2004.

On October 29, 2004, Loris attended another Improvement Plan meeting. In a letter to Loris dated November 5, 2004, Moore wrote: "At this time, you are working toward successfully meeting the objectives of the Team Leader Improvement Plan."

On November 30, 2004, Loris attended a Team Leader Improvement Plan meeting, which prompted Moore to write her a letter, expressing her concern about comments made by Loris "which did not promote harmony and positive relationships." Moore elaborated:

> For whatever reason, your responses at this meeting were very different than the October 29, 2004 meeting. In fact, given the hostile tone of your comments, I stated that I have a concern about the hostility spilling over to students. You replied, "Are you threatening me?" You turned to Ms. Hibbard and asked, "Is that a veiled threat?" I also indicated, that based on the November 30 meeting, I would be unable to recommend your continuation as a team leader. You stated, "Things are different. A lot has happened because of what you wrote."

On December 13, 2004, Bruce Mellion, president of NFT, informed Loris in writing that she had been relieved of her responsibilities as a West Rocks building steward.

On February 17, 2005, Moore held a meeting with Loris and another teacher who had reported that Loris exhibited hostility toward him. However, the meeting was adjourned because Loris had brought in a tape recorder to record the meeting without anyone's knowledge. The meeting was rescheduled for March 15, but Loris was absent on that day. The meeting did finally occur on March 23, 2004, at which time Loris complained that the memorandum from the complaining teacher had never been provided to her despite her Freedom of Information ("FOIA") request. Loris asserted that she would not participate in the meeting without compliance with her FOIA request.

Loris' March Improvement Plan meeting was also cancelled after Moore noticed that Loris had again brought a tape recorder and she refused to comply with Moore's request to place the recorder in the next room.

Loris did not participate in the teacher evaluation meetings with Moore scheduled for April 4, 2005 or on May 20, 2005, because Loris maintained that Moore had not provided her with the requested documents.   On June 6, 2005, Ruotolo informed Loris that she was not relieved from her responsibility to participate in the teacher evaluation process despite her perception that she had not received these documents.

On June 8, 2005, Loris attended a meeting with Moore to discuss her team leader evaluation.  In the 2004-2005 team leader evaluation, Moore wrote that Loris had failed "to meet the basic requirement of being a positive role model," and to "fulfill the requirements of her Improvement plan."  Moore noted that Loris had "refused to comply with the directives of the principal."   She stated further that she would not recommend Loris to continue as a team leader.[4]

On June 17, 2005, Loris e-mailed Mellion stating, inter alia:

> My expectations of you, as newly re-elected President of the Norwalk Federation of Teachers are the following: 1) You will abide by your policy of never allowing the victim to be victimized.  2) You will be present and on time for the 6/21/05 meeting. 3) You will represent my interests and contractual rights as a member of the Norwalk Federation of Teachers.

Mellion replied by e-mail: "Until such time as you act in a courteous and professional manner towards me and designated NFT representatives, I don't plan to communicate with you.  If you are officially requesting union representation that will be provided consistent with how such decisions are made."

---

[4] The team leader receives a stipend.  For her work as team leader during 2003-2004 year, plaintiff received a stipend of $5,165.

In a letter dated July 19, 2005, Corda wrote to Loris about a transfer to Nathan Hale Middle School to fill an eighth-grade language arts position for the 2005-2006 school year:

> This letter follows up on the discussions and correspondence that have taken place over the past month between your legal counsel and the Norwalk Board of Education's attorney regarding your request that you no longer be required to report to, or be supervised by, Dr. Lynne C. Moore, the Principal at West Rocks Middle School. The Board cannot and will not grant your request at West Rocks. There is, however an eighth-grade language arts position available for the 2005-2006 school year at Nathan Hale Middle School. This position would satisfy your preference to continue teaching language arts at the middle-school level. Therefore, in response to your request for a different supervisor, and given your belief that you cannot continue to maintain an amicable and productive working relationship with Dr. Moore, as well as our focus on your continued success, I would like to meet with you at 9:30 AM, on Tuesday, July 26, 2005 to discuss your transfer to Nathan Hale Middle School to a Grade 8 Language Arts position for the 2005-2006 school year.

In a letter dated July 21, 2005, Corda stated that he was pleased that Loris had accepted the position at Nathan Hale. Loris maintains that this transfer was involuntary.

Hibbard

Plaintiff Hibbard, a Caucasian woman, is a teacher at West Rocks Middle School. On February 16, 1999, she commenced her employment with the Board. She taught sixth grade at WRMS until June 2003. Hibbard is a close associate of Loris.

On June 23, 2003, Hibbard was assigned to a seventh-grade position teaching language arts/social studies at WRMS. She asserts that this was an involuntary transfer.

On August 15, 2003, Hibbard, who was assigned to teach seventh grade, submitted a letter of interest in response to a vacancy announcement for a position teaching sixth-grade language arts at WRMS. Hibbard did not get the position.

On August 19, 2003, Moore notified Hibbard that she was still assigned to teach grade-seven language arts/social studies. In September 2003, Hibbard filed a grievance regarding Moore's denial of her request for transfer to the grade-six position. After the grievance was denied by Moore, Hibbard appealed to Corda, who also denied her grievance.

In May 2004, Hibbard requested to have her teaching assignment changed to a sixth-grade language arts position. Moore responded that she would not transfer Hibbard to a sixth-grade position since it "was not an effective practice to move a teacher to a new assignment each year." Thereafter, Hibbard filed a grievance because she had not been transferred to a sixth-grade postion.

Both Hibbard and Loris have filed complaints with Connecticut Commission on Human Rights and Opportunities ("CHRO").

## DISCUSSION

A motion for summary judgment will be granted where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." Bryant v. Maffucci, 923 F. 2d 979, 982 (2d Cir. 1991).

The burden is on the moving party to demonstrate the absence of any material factual issue genuinely in dispute. Am. Int'l Group, Inc. v. London Am. Int'l Corp., 664 F. 2d 348, 351 (2d Cir. 1981). In determining whether a genuine factual issue exists,

the court must resolve all ambiguities and draw all reasonable inferences against the moving party.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986).

If a nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof, then summary judgment is appropriate.  <u>Celotex Corp.</u>, 477 U.S. at 323.  If the nonmoving party submits evidence which is "merely colorable," legally sufficient opposition to the motion for summary judgment is not met.  <u>Liberty Lobby</u>, 477 U.S. at 24.

<u>Retaliation based on Exercise of Free Speech</u>

Plaintiffs Loris and Hibbard allege that defendants' retaliatory acts violated their rights to free expression secured by the First Amendment.

A plaintiff asserting First Amendment retaliation must show by a preponderance of the evidence: (1) that the speech was constitutionally protected; (2) that she suffered an adverse employment decision; and (3) that the speech at issue was a substantial, causal or motivating factor in the decision.  <u>Morrison v. Johnson</u>, 429 F.3d 48, 51 (2d Cir. 2005).  However, even if a plaintiff can establish these elements, defendants may still prevail if they demonstrate that they would have taken the same adverse action in the absence of the protected speech, or that plaintiff's speech was likely to disrupt the government's activities, and the likely disruption was sufficient to outweigh the First Amendment value of plaintiff's speech.  <u>Mandell v. County of Suffolk</u>, 316 F.3d 368, 383 (2d Cir. 2003).

In considering whether plaintiffs' speech is entitled to protection, the Court must first determine whether each plaintiff was speaking as a citizen for First Amendment

purposes pursuant to <u>Garcetti v. Ceballos</u>, 547 U.S. 410 (2006).  <u>Garcetti</u> instructs "that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."  <u>Id.</u> at 419-420 (First Amendment does not empower public employees to constitutionalize the employee grievance).

The proper inquiry into whether speech was made as a public employee "is a practical one" and "the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes."  <u>Id.</u> at 424-425.

Even if a plaintiff can satisfy <u>Garcetti</u>'s definition of protected speech, she must then demonstrate that the speech or associational activity touched on a matter of public concern   <u>Cobb v. Rouse</u>, 363 F.3d 89, 107 (2d Cir. 2004).  Whether a public employee's expressive conduct addresses a matter of public concern is a question of law to be determined in light of "the content, form, and context" of the expressive conduct "as revealed by the whole record."  <u>Connick v. Myers</u>, 461 U.S. 138, 147-148 (1983).  In <u>Connick</u>, the Supreme Court held that questions pertaining to office morale, the need for a grievance committee, and the office transfer policy did not address matters of public concern; however, the question of whether employees felt pressure to work on political campaigns did address a matter of interest to the community and was therefore of public concern.

Courts have held that an employee's filing of a grievance relative to a personal employment dispute is not of public concern. See <u>Coszalter v. City of Salem</u>, 320 F.3d 968, 973 (9th Cir. 2003) (speech that concerns personal employment disputes and grievances is generally not of public concern); <u>Galligan v. Town of Manchester</u>, 2003 WL 21146710 (D. Conn. 2003) (filing union grievance relative to alleged harassing conduct, job duties, and need for reasonable accommodation had nothing to do with matters of public concern). A complaint filed concerning employment discrimination that does not seek "relief against pervasive or systemic misconduct by a public agency or public officials" or "to correct allegedly unlawful practices or bring them to public attention" does not touch on a public concern but concerns only an individual employment situation. <u>Saulpaugh v. Monroe Comm. Hosp.</u>, 4 F.3d 134, 143 (2d Cir. 1993).

In this instance, Loris alleges that she suffered retaliation for the filing of grievances and a complaint with Human Resources relative to Moore's treatment of her. However, such exercise of speech was made pursuant to Loris' position as a public school teacher rather than as a citizen. In her letter regarding the Gold Team's failure to participate in the Martin Luther King Town Meeting, Moore explained that it was "expected" that Loris and her team would follow the directives of the school leadership, and that a grievance should be filed if she did not agree with a decision of administration. The NFT collective bargaining agreement sets forth the relevant procedure for bringing such grievances. In this respect, Loris followed Moore's directive and that of the collective bargaining agreement by filing grievances and complaints

challenging Moore's employment decisions relative to corrective or disciplinary action and performance assessments. Accordingly, the Court finds that Loris' exercise of speech fell within her employment duty and is not entitled to First Amendment protection. Alternatively, upon review of the grievances, the Court finds that Loris' speech concerned her individual employment situation rather than issues of public concern.

Similarly, <u>Garcetti</u> is fatal to Hibbard's claim of retaliation based on her grievance filings. Hibbard's supplemental brief asserts that her grievances complained about defendants' alleged refusal to interview Hibbard or consider her for promotional jobs or other available teaching positions. Again, Hibbard was following the proper chain of command utilizing the grievance procedure to challenge employment decisions. Additionally, these grievances relate entirely to Hibbard's own employment situation and therefore fall outside of the realm of public concern

For purposes of this ruling, the Court assumes that Hibbard's letter writing and expression of support for Loris meet <u>Garcetti</u>'s definition of protected public employee speech. However, Hibbard's claim still fails because she cannot prove that such expression touched upon a matter of public concern. Her expression of support for Loris concerned Loris' employment situation and the relationship between Hibbard and Loris rather than a matter of public interest.

Accordingly, the Court will grant summary judgment on plaintiffs' claims of retaliation for exercise of their right to free expression.

Racial Discrimination

Plaintiffs Loris and Hibbard have each alleged that they suffered discrimination in violation of the equal protection clause and Title VII due to each plaintiff's respective status as Caucasian women.  Defendants argue that no evidence supports plaintiffs' claims.  The Court agrees and will grant summary judgment on the claims of racial discrimination.[5]

Claims alleging violation of the equal protection clause are analyzed pursuant to the same standards as Title VII.  Annis v. County of Westchester, 136 F.3d 239, 245 (2d Cir. 1998).

To establish her prima facie claim of racial discrimination based on disparate treatment, each plaintiff must demonstrate that (1) she belongs to a protected class; (2) she was performing her duties satisfactorily; (3) she suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination.  Although this initial burden is not onerous, each plaintiff must show that the adverse employment action was not made for legitimate

---

[5]Both Hibbard and Loris appear to advance a contention that Moore treated African-American students more favorably than white teachers.  However, this evidence does not raise an inference that either Loris or Hibbard were treated differently than other non-white similarly situated individuals.  To be "similarly situated," the individuals with whom plaintiffs attempt to compare themselves must be similarly situated in "all material respects" and have "engaged in comparable conduct."  Shumway v. United Parcel Service, Inc., 118 F.3d 60, 64 (2d Cir. 1997).  Students and teachers are subject to different expectations as to performance, qualifications and discipline and cannot be considered similarly situated.  Accordingly, any evidentiary material relevant to Moore's treatment of African-American students does not raise an inference that either Loris or Hibbard were subjected to racial discrimination.

reasons.  Thomas v. St. Francis Hospital and Medic. Ctr., 990 F. Supp. 81, 86 (D. Conn. 1998).

If the plaintiff establishes a prima facie case, defendants must articulate a legitimate, non-discriminatory business reason for the alleged discriminatory action. Each plaintiff must then prove by a preponderance of the evidence that the supposed legitimate reason is actually a pretext for discrimination.  St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993).

Construing the complaint most favorably to the non-moving parties, Loris asserts that adverse employment acts include negative letters placed in her personnel file in 2000, reprimands and false accusations, rudeness and schedule change related to the student visitor, grievance denial relative to the conduct of a co-worker in 2003, intrusive monitoring in 2003 and 2004, failure to be selected for the Subject Area Leader in 2003 and 2004, negative performance evaluation in 2004, loss of her team leadership position, removal of co-workers from her team, failure to be allowed to mentor other teachers, and involuntary transfer.  Hibbard asserts monitoring, a negative evaluation, involuntary transfer, and failure to be considered or interviewed for the available sixth-grade positions.

To satisfy the adverse employment action requirement, each plaintiff must allege a materially adverse change in the terms and conditions of her employment that is more disruptive than a mere inconvenience or an alteration of job responsibilities.  Demoret v. Segarelli, 451 F.3d 140, 151 (2d Cir. 2006).  An adverse employment action may include "a termination of employment, a demotion evidenced by a decrease in wage or

19

salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other  indices ... unique to a particular situation." <u>Beyer v. County of Nassau</u>, 524 F.3d 160, 163 (2d Cir. 2008).

<u>Loris</u>

The Court finds that plaintiff Loris has not adduced evidence that the negative letter written by Moore in 2000, rudeness, change to the visitor's schedule, removal of co-workers from her team, monitoring, failure to be allowed to mentor other teachers, and grievance denial relative to her co-worker's conduct constitute adverse employment action that had a material impact on the terms or conditions of her employment. <u>Henton v. City of New London</u>, 2008 WL 2184933 (D. Conn. 2008).

Similarly, Loris has failed to demonstrate that the transfer resulted in any objective indicia of material disadvantage to her terms of employment. <u>See</u> <u>Williams v. R.H. Donnelley Corp.</u>, 368 F.3d 123, 128 (2d Cir. 2004) (plaintiff must proffer objective indicia of material disadvantage to employment terms); <u>cf.</u> <u>Beyer</u>, 524 F.3d at 164 (citing evidence that plaintiff had submitted raising genuine issue of fact as to whether position sought was objectively and materially better than position occupied).  In this instance, the evidence indicates that Moore had already recommended against Loris retaining her team leader position prior to the transfer; thus, the fact that she did not have a team leader position at the new school did not change the terms of her employment.  Plaintiff has not cited any other indicia of how she was disadvantaged as to her terms of employment by the transfer.

However, plaintiff has alleged an adverse employment action relevant to the failure to hire her for as a Subject Area Leader and loss of her team leader position, since plaintiff lost the benefit of the stipends associated with these positions. <u>See</u>, <u>e.g.</u>, <u>Rothenberger v. New York City Police Dept.</u>, 2008 WL 2435563 (E.D.N.Y. 2008) (denial of opportunity to earn overtime work may constitute an adverse employment action). Further, taken in the light most favorably to the non-moving party, plaintiff has raised an issue of fact as to whether the reprimands, false accusations and negative evaluations are adverse employment actions. These actions may be construed as contributing to plaintiff's failure to retain her team leader position and the failure to hire her as a Subject Area Leader. Accordingly, the Court will assume for purposes of ruling on this motion that the reprimands, alleged false accusations, negative performance evaluations constitute adverse employment actions.

Defendants argue that none of the alleged employment actions occurred under conditions giving rise to inference of discrimination as required for the fourth prong of the prima facie case. In light of the <u>de minimus</u> burden and the record construed most favorably to plaintiff, the Court finds that plaintiff has established a prima facie case as to these alleged adverse employment actions. Accordingly, the Court will consider defendants' proffer of legitimate non-discriminatory business reasons.

As a legitimate non-discriminatory business reason for the decision not to select plaintiff Loris as a Subject Area Leader, defendants assert that the selected candidates demonstrated more attractive skills and qualities for the position. An employer may "choose among equally qualified candidates, provided the decision is not based on

unlawful criteria." <u>Texas Dept. Of Community Affairs v. Burdine</u>, 450 U.S. 248, 259 (1981). In general, the Court should not second guess business decisions, and evidence that an employer merely used poor business judgment as to an employment decision is insufficient to establish a genuine issue of fact as to the credibility of the employer's reasons. <u>Dister v. Continental Group, Inc.</u>, 859 F.2d 1108, 1116 (2d Cir. 1988). A plaintiff may defeat summary judgment for the defendant by demonstrating that the employer's business decision was so lacking in merit as to call into question its genuineness. <u>See</u> <u>Gerardi v. Hofstra Univ.</u>, 897 F. Supp. 50, 58 (E.D.N.Y. 1995). Plaintiff asserts that a less qualified black candidate, Fulton, was selected in 2003, and that a candidate with only ten months teaching experience was selected in 2004. Plaintiff has adduced no evidence relevant to Fulton's qualifications other than her self-serving averment that he was less qualified. Similarly, she has not provided any evidentiary material regarding the individual who was selected in 2004, except for her averment that the individual selected had only ten months teaching experience. The Court has so little information concerning the selected candidates that it cannot find defendants' decisions to be so lacking in merit as to raise an inference of pretext. Plaintiff has not provided any evidence indicating that either individual was not qualified to serve as a Subject Matter Leader. Accordingly, the Court will grant summary judgment on her claim that she was not selected for to serve as a Subject Area Leader due to racial discrimination.

With respect to the reprimands, alleged false accusations, negative performance evaluations, and failure to be recommended for the team leader position, defendants

maintain that such actions were legitimate responses to Loris' performance. Again, Loris has failed to adduce evidence giving rise to inference that such conduct was actually motivated by a discriminatory animus.

By affidavit, two Caucasian female teachers aver that they believe Moore treated black students more favorably than white females and exhibited hostility to them and other Caucasian female teachers. However, the statements from these affidavits pertain to the experiences and perceptions of the affiants and do not raise an inference of discrimination as to the alleged adverse employment actions asserted by Loris, which involve different factual circumstances.

Upon review of the record, the Court finds that no evidence indicative of an underlying racially discriminatory animus for the asserted reprimands, false accusations, negative performance evaluations, and failure to be recommended for the team leader position.

Hibbard

Summary judgment is also appropriate on Hibbard's claims of racial discrimination. Hibbard has failed to demonstrate that her transfer or the denial of the transfer to the sixth-grade language arts position resulted in any materially adverse change in the terms and conditions to her employment. Similarly, no evidence indicates that Moore's "negative" comment in Hibbard's evaluation regarding acceptance of "cultural behavior" caused Hibbard to sustain any materially adverse change to her employment terms. Thus, the Court cannot consider these actions as adverse for purposes of the prima facie case.

However, summary judgment is still appropriate even if the Court assumes that denial of plaintiff's application for the sixth-grade position constituted an adverse employment action. Defendants proffer that Moore decided that Hibbard should remain teaching the seventh-grade language arts and social studies because she was certified for that position and was familiar with the materials and incoming students. Plaintiff has failed to proffer any evidence relevant to defendant's selection for the position that would raise an inference of discrimination or that the reasons given for denial of Hibbard's application were pretextual.

<u>Retaliation for Filing Grievances and Complaints</u>

Plaintiffs claim that defendant Board of Education violated Title VII by retaliating against them due to their filings of grievances and administrative complaints.

The Title VII prima facie case of retaliation requires each plaintiff to show by a preponderance of evidence: (1) that she engaged in protected activity; (2) that the employer was aware of the activity; (3) that the employer took adverse action against the plaintiff; and (4) that a causal connection exists between the protected activity and the adverse action. Once plaintiff establishes a prima facie case, the burden-shifting paradigm of <u>McDonnell Douglas</u> applies.

In the context of a retaliation claim, an employment action is materially adverse if "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." <u>Burlington N. and Santa Fe Rail Co. v. White</u>, 548 U.S. 53, 68 (2006). As <u>Burlington</u> explained, a court considering material adversity should separate significant from trivial harms. The Second Circuit has instructed that oral and written

warnings do not generally amount to materially adverse conduct. <u>Chang v. Safe Horizons</u>, 254 Fed. Appx. 838, 839 (2d Cir. 2007). The application of the employer's disciplinary policies does not, without more, constitute adverse employment action. <u>Joseph v. Leavitt</u>, 465 F.3d 87, 91 (2d Cir. 2006).

The causal connection between a protected activity and an adverse employment action may be established by direct evidence or by showing the protected activity was closely followed in time by the adverse action. <u>Lovejoy-Wilson v. NOCO Motor Fuel, Inc.</u>, 263 F.3d 208, 224 (2d Cir. 2001). Generally, courts have found that a time period of one year between the protected activity and the alleged retaliatory act is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action. <u>See Chang</u>, 254 Fed. Appx. at 840 (no causal nexus based on temporal proximity where alleged retaliation occurred almost one year following protected activity); <u>Deravin v. Kerik</u>, 2007 WL 1029895, *11 (S.D.N.Y. 2007) (collecting cases). Additionally, a plaintiff cannot rely on temporal proximity where "gradual adverse job actions" commenced prior to the protected activity. <u>Slattery v. Swiss Reinsurance Am. Corp.</u>, 248 F.3d 87, 85 (2d Cir. 2001).

<u>Loris</u>

Loris' protected activity of filing administrative grievances and complaints occurred in February 2000, and June, October and December 2003. The instant action was filed on June 24, 2004. On her retaliation claim, Loris asserts the same employment actions alleged as the bases of her racial discrimination claims. In light of the broader articulation of an adverse employment action in the context of retaliation,

the Court assumes, for purposes of ruling, that plaintiff has satisfied the third prong of of the prima facie case.[6]  Garcia v. New York City Admin. of Children's Servs., 2007 WL 2822153 (S.D.N.Y. 2007).

Loris cannot maintain that the negative letter concerning the Gold Team's failure to follow Moore's directive relevant to the Martin Luther King Day constitutes retaliation for the subsequent grievance filed in 2000.  Additionally, plaintiff cannot establish that the June 2003 selection of another candidate for the position of Subject Area Leader constitutes retaliation for the grievance filing in 2000.  Summary judgment will enter on these claims.

The monitoring, reprimands, denial of grievances, negative evaluations, second rejection of plaintiff as the Subject Area Leader, and loss of her team leader position occurred between June 2003 and June 2005.  Even assuming that plaintiff has satisfied the prima facie case, as previously discussed regarding the claim of racial discrimination, Loris' evidence evinces no inference that defendant's asserted non-retaliatory business reason — corrective action or legitimate responses to Loris' performance — was pretext for retaliation.

The transfer decision occurred in July 2005, more than a year after plaintiff filed her administrative grievances and complaints and the instant federal complaint. Accordingly, the evidence does not give rise to a causal connection based on temporal proximity.  However, even if the Court assumes that plaintiff can establish a prima facie

---

[6]However, the Court finds that the alleged rudeness and scheduling change relative to the student visitor are trivial harms that do not rise to the level of materially adverse employment action.

case based on the transfer, defendant sets forth the legitimate non-retaliatory reason that it transferred plaintiff so that she would no longer be supervised by Dr. Moore, as she had requested.  Although plaintiff contends that the transfer was not voluntary, no evidence indicates that defendant's proffered legitimate business reason is a pretext for retaliation.  Accordingly, summary judgment will enter on Loris' claims of retaliation against the Board.

Hibbard

Hibbard's first grievance was filed in September 26, 2003.  She bases her retaliation claim on the same alleged adverse employment action as asserted in her racial discrimination claims.

As an initial matter, Moore's reprimand of Hibbard for failing to correct a student's behavior and her inclusion of a "negative" comment in Hibbard's evaluation regarding "cultural behavior" do not represent corrective actions that constitute materially adverse employment action.  See Chang, 254 Fed. Appx. 838, 839 (2d Cir. 2007) (oral and written warnings were not materially adverse actions).

The Court assumes, for purposes of ruling on this motion, that the 2003 transfer and refusal to transfer Hibbard or denial of Hibbard's application for the sixth-grade position constitute adverse employment action.  However, these events occurred prior to Hibbard's filing of a grievance in September 2003.  Accordingly, the Court can draw no inference that they are the result of retaliation for Hibbard's grievance filing.

The Court also assumes that the denial of Hibbard's 2004 application for transfer was an adverse employment action and that Hibbard has met the prima facie case as

to this alleged employment action.  However, Hibbard's evidence does not demonstrate that defendant's legitimate business reason — that it was not effective to move a teacher to a new assignment each year — was pretextual for retaliatory animus. Accordingly, summary judgment will enter on Hibbard's claim of retaliation.

Violation of Due Process Clause

In the complaint, plaintiffs allege that their federal constitutional rights to due process were violated by the involuntary transfers or the denials of their requests to transfer.  In their brief, plaintiffs assert that "in singling them out for retaliatory discipline because of their protected speech and their race, defendants have also violated their right to due process under the Fourteenth Amendment in that the plaintiffs were denied a fair hearing and opportunity to be heard on their grievances before an unbiased tribunal."  Reading the brief and complaint together, plaintiffs assert a liberty interest in their right to be free from "stigmatizing disciplinary and adverse employment action" and a deprivation of property interest in their positions.  Summary judgment is appropriate on plaintiffs' due process claims because they did not suffer a deprivation of a property or liberty interest.

The Due Process Clause of the Fourteenth Amendment requires that, generally, a person must be afforded the opportunity for a hearing prior to being deprived of a constitutionally protected liberty or property interest.   U.S. Const. amend XIV, § 1; Bd. of Regents v. Roth, 408 U.S. 564, 569-70 & n. 7 (1972).  Thus, in order to sustain an action for deprivation of property without due process of law, a plaintiff must identify a

property or liberty interest, and show that the state actor has deprived plaintiff of that interest without due process.

The fundamental requisite of procedural due process is the opportunity to be heard.  See Boddie v. Connecticut, 401 U.S. 371, 377 (1971).   This opportunity must be granted within a meaningful time and manner.  Armstrong v. Manzo, 380 U.S. 545, 552 (1965).  Further, the hearing must be "appropriate to the nature of the case." Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 313 (1950).

In light of this Court's holding that the evidence evinces no inference of either discriminatory or retaliatory animus against plaintiffs, the Court cannot find that plaintiffs have proved a liberty interest in their right to be free from discriminatory and retaliatory discipline.

Plaintiffs' claims of due process deprivations of their property interests fare no better.  Property interests are created not by the Constitution itself, but are created and defined by independent sources such as state statutes, regulations, municipal ordinances, and contracts.  Board of Regents v. Roth, 408 U.S. at 577.   The Connecticut Supreme Court has held that, pursuant to Connecticut General Statutes section 10-151(d), a tenured teacher retains a right only to a generic position as a teacher, rather than a right to a specific position or a right to teach certain classes. Sekor v. Board of Education, 240 Conn. 119, 128 (1997).  Thus, the Court finds that plaintiffs cannot maintain a deprivation of a property right based on their transfers or denial of requests to transfer.  Accordingly, summary judgment will enter on the due process claims.

<u>State Law Claims</u>

Plaintiffs' remaining claims are premised on state law. Having dismissed all of the federal claims, the Court will decline to exercise supplemental jurisdiction over the remaining state-law claims pursuant to 28 U.S.C. § 1367(c)(3).

## **CONCLUSION**

For the foregoing reasons, defendants' motion for summary judgment [doc. #91] is GRANTED as to the federal claims. The Court declines to exercise supplemental jurisdiction over the state-law claims pursuant to § 1367. Accordingly, the state-law claims are dismissed without prejudice.

The clerk is instructed to close this case.


_____/s/_____
Warren W. Eginton
Senior U.S. District Judge

Dated at Bridgeport, Connecticut this _20___th day of August, 2008.